# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

GREG GILSINGER,

                            Plaintiff,

v.                                                              Case No. 21-CV-831-JPS

CITIES AND VILLAGES MUTUAL
INSURANCE COMPANY,                                  **ORDER**

                            Defendant.

Plaintiff Greg Gilsinger ("Gilsinger") sues Defendant Cities and Villages Mutual Insurance Company ("CVMIC"), his former employer. At this juncture, the operative complaint is Gilsinger's second amended complaint. ECF No. 54. Since the filing of the second amended complaint, the parties stipulated to the dismissal of former defendant Andrew Serio ("Serio") and former intervenor defendant American Family Mutual Insurance Company, ECF No. 60, which stipulation the Court adopted, ECF No. 63. The parties have since also stipulated to the dismissal without prejudice and without costs of Gilsinger's claim for injury to business in violation of Wis. Stat. § 134.01 against CVMIC. ECF No. 68. The Court will adopt that stipulation.

Gilsinger's remaining claims against CVMIC are (1) Fourteenth Amendment violation of the right to procedural due process; (2) First Amendment retaliation; (3) common law defamation; (4) common law intentional interference with professional relationships; (5) common law breach of contract; (6) common law promissory estoppel; and (7) common law breach of the covenant of good faith and fair dealing. ECF No. 74 at 1.

Before the Court is CVMIC's motion for summary judgment on all seven remaining claims. ECF No. 71. The motion is fully briefed, ECF Nos. 77, 80, 87, and for the reasons set forth below, will be granted.

## 1. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016) (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 248 (7th Cir. 2015)). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255 and *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 505 (7th Cir. 2010)).

## 2. RELEVANT FACTS[1]

### 2.1 CVMIC Background

CVMIC is a member-owned, self-funded municipal mutual insurance company created by the cooperative participation of Wisconsin

---

[1]The parties submitted a stipulated statement of undisputed facts. ECF No. 74. For purposes of CVMIC's motion for summary judgment, the Court will adopt those stipulated facts that are *material*. The Court made minor, non-substantive edits, but had to significantly rework the order of the facts into a narrative timeline consistent with its pretrial order. ECF No. 36 at 3. In the future, facts should be

municipalities with the purpose of providing liability insurance coverage for Wisconsin municipalities. CVMIC's creation was approved by the Wisconsin Department of the Insurance Commissioner. CVMIC was formed under the Wis. Stat. ch. 611 for mutual insurance companies. CVMIC files a Form 1120-C corporate tax return. CVMIC uses the practice of statutory accounting principles governed by the Office of the Commissioner of Insurance, and not by the Governmental Accounting Standards Board. CVMIC's Chief Financial Officer, Michelle Voskuil ("Voskuil"), testified that CVMIC is allowed to invest in stocks and equities, unlike governmental entities. CVMIC does not participate in the Wisconsin Retirement Fund.

CVMIC's income is excluded from taxable income under Section 115 of the Internal Revenue Code because it "perform[s] an essential government function." CVMIC is exempt from sales tax. CVMIC's application for Wisconsin sales and use tax exemption states that CVMIC is a "Wisconsin Governmental Unit or agency thereof." Voskuil testified that CVMIC's exempt status from Wisconsin sales and use tax is because CVMIC's income comes from public funds, i.e., premiums from the

---

submitted in a logical narrative or chronological order, rather than strewn together with little rhyme or reason. Internal citations are omitted for brevity, though the Court notes with citations where it adds information from the record to fill in gaps in the narrative.

Gilsinger and CVMIC also each filed a one-page set of itemized disputed facts. ECF Nos. 75, 84. Each side responded to the other's itemized disputed facts. ECF Nos. 83, 88. The Court will note those disputes where applicable in the Analysis section. In accordance with its pretrial order, ECF No. 36 at 4, the Court disregards any facts introduced in the parties' briefing that are not set forth in the statements of undisputed or disputed facts. *See Kreuziger v. Milwaukee County*, 617 F. Supp. 3d 970, 974 (E.D. Wis. 2022), *aff'd sub nom. Kreuziger v. Milwaukee Cnty., Wisconsin*, 60 F.4th 391 (7th Cir. 2023).

municipalities. In a 1991 letter, the Wisconsin Department of Workforce Development stated that CVMIC was considered to be a "governmental agency" and a "government unit" for unemployment insurance purposes. CVMIC allows its employees, on a voluntary basis, to participate in an IRC § 457(c) deferred compensation plan, but CVMIC provides no contributions to this plan. CVMIC does not file any Form 5500 Annual Reports or Form 5500-SF Short Form Annual Reports, although Voskuil testified that CVMIC is not required to do so as it has less than 100 employees. The day-to-day operations of CVMIC are conducted by CVMIC Management, as defined below.

Gilsinger came to believe that CVMIC was a governmental entity after his employment was terminated. During his employment with CVMIC, no one at CVMIC ever represented to Gilsinger that CVMIC was a governmental employer.

### 2.2 CVMIC Employment Terms

The 2015 CVMIC employee manual (the "Employee Manual") designates all CVMIC employees as at-will employees. The Employee Manual states:

> This Employee Policies and Procedures Manual (the "Employee Manual") provides the employees of Cities and Villages Mutual Insurance Company (CVMIC) with a guide concerning the general operating principles and policies of CVMIC. While CVMIC believes wholeheartedly in the policies, practices and procedures described here, they are not conditions of employment. They are intended as guidelines, and the Employee Manual does not create a contract between CVMIC and any of its employees.
>
> Employment with CVMIC is at-will, meaning one's employment is voluntary and is subject to termination by either party, with or without cause, and with or without

notice, at any time. Nothing in these policies shall be interpreted to be in conflict with, or to eliminate or modify in any way, the employment at-will status of CVMIC employees. This policy of employment at-will may not be modified by any officer or employee and shall not be modified in any publication or document. The only exception to this is a written employment agreement signed by the Executive Director.

Gilsinger testified that a "last chance agreement" offered to a former subordinate of his, Merrie Strike ("Strike"), was part of a pattern or practice of "progressive discipline." Gilsinger also testified that in conversations about Strike's progressive discipline, CVMIC's Human Resources Director, Jean Cole ("Cole"), told Gilsinger that "nobody is really at will anymore." The last chance agreement offered by CVMIC to Strike contains a bold-faced, all-caps provision stating: "**THIS AGREEMENT IN NO WAY CHANGES MERRIE STRIKE'S AT WILL EMPLOYMENT STATUS WITH CVMIC.**" Gilsinger signed the last chance agreement as Strike's superior.

The Employee Manual also includes a grievance procedure (the "Grievance Procedure"):

### GRIEVANCE PROCEDURE

CVMIC endeavors to treat all employees fairly. In the event an employee has a concern about any matter concerning employment, the employee may address it as follows:

1.  Initially discuss the concern with the direct supervisor and attempt to resolve the concern without further action.

2.  If an employee wishes to continue further dialogue they should, address the concern, in writing, to the Human Resources Manager, Director of Operations or the Executive Director.

3. If following the Human Resources Manager, Director of Operations' or Executive Director's review, the employee is not satisfied with the decision rendered, the employee may present a written appeal to the CVMIC Board of Directors, whose decision will be final.

There is no provision for an appeal hearing in the Employee Manual.

### 2.3    Gilsinger's Employment with CVMIC

Gilsinger was hired by CVMIC in 1997 as a worker's compensation claims manager and was promoted to the Director of Workers Compensation Claims in 2016. No formal written employment contract exists between Gilsinger and CVMIC. Gilsinger concedes that the Employee Manual is not an employment contract between himself and CVMIC. Gilsinger signed an acknowledgment that he received the Employee Manual on February 2, 2016. The language within the Employee Manual stating that its terms do not create a contract and that CVMIC employment is at-will did not change from February 2, 2016, through Gilsinger's termination in 2019.

In early 2019, CVMIC's Director of Liability Claims confidentially informed Cole, Voskuil, and CVMIC's Chief Executive Officer, Ken Horner ("Horner"), (collectively, "CVMIC Management") of his intent to retire by July 2020. That information was relayed to the CVMIC Board of Directors (the "Board"). Thereafter, Horner claims that he began assessing organizational needs and determined that having two claims directors (Workers Compensation and Liability) was not optimal given that a single director could manage both activities. Gilsinger alleges that the restructuring was pretextual.

On October 30, 2019, Horner outlined the reorganization plan and the elimination of Gilsinger's position to the Board. Gilsinger's employment

with CVMIC was terminated on October 31, 2019, which is when Gilsinger was first notified of his termination. The cited reason for Gilsinger's termination was an organizational reorganization. Gilsinger believed that his employment had terminated with that notice. Gilsinger was the only employee whose position was eliminated at that time. Gilsinger was offered a severance agreement that he had twenty-one days to accept, and he was permitted to remain on CVMIC's payroll during that consideration period.

Gilsinger requested to appeal the elimination of his position to the Board in person at the November 20, 2019 Board meeting. On November 15, 2019, Horner emailed Gilsinger, acknowledged receipt of his request, and confirmed that his appeal would be heard in person at the Board meeting on November 20, 2019. On November 18, 2019, Horner emailed Gilsinger laying out the steps set forth in the Grievance Procedure and inquired whether Gilsinger was waiving his right to a written appeal in lieu of an in-person appeal to the Board. Horner's email stated that if Gilsinger did not intend to waive his written appeal, he would need to bring the written appeal to the Board meeting on November 20, 2019. Gilsinger responded and indicated that he was not waiving his written appeal. On November 19, 2019, Horner emailed Gilsinger and stated instead that, pursuant to the Grievance Procedure, a written appeal could be tendered but that there would be no in-person opportunity to address the Board on his appeal.

On November 20, 2019, Gilsinger filed his written appeal with the Board challenging the reason for his termination. The appeal to the Board stated, "I believe the organizational re-organization reason that was given for my termination was a pretext. The following events illustrate why I believe this is the case." Those events, as described in the written appeal,

included the following: (1) Horner pressured Gilsinger to hire Horner's granddaughter, which made Gilsinger uncomfortable; (2) Horner falsely accused Gilsinger of not finishing the 2015 performance evaluations; (3) Horner told Gilsinger "life [is] not fair" when Gilsinger approached him about being kept out of a paygrade, and other allegations regarding Gilsinger's pay as compared to other CVMIC employees' pay; (4) Horner's instructions to Gilsinger to destroy paygrade documents; (5) Horner's "public flogging" of the workers compensation department; (6) Horner's written warning to Gilsinger after he requested changes to the Employee Manual at a Board meeting; (7) another employee's vacation time; (8) special treatment towards other employees; and (9) CVMIC's "history of sharing information with direct competitors." ECF No. 72-9.

Gilsinger's second amended complaint categorizes these issues, among others that were raised to the Board prior to the written appeal and which are disputed and thus discussed below in the Analysis section, as "misappropriation of funds," "breaches of public trust," and "lack of integrity and incompetence." ECF No. 54 at 5. Gilsinger intended to raise these issues with the Board in an in-person hearing.

One of the attachments to Gilsinger's appeal was an email forwarded from his work email to his email address created for his personal business, Quality Medical Care Solutions ("QMCS"), which business is discussed further below. This prompted CVMIC to do a search of its file server to see whether there were additional emails involving Gilsinger's other email accounts. The search revealed many emails and multiple transfers of documents from Gilsinger's CVMIC email to Gilsinger's other email accounts.

On November 22, 2019, Horner withdrew Gilsinger's offer for a severance agreement and terminated him immediately for cause. Horner sent Gilsinger a letter charging that CVMIC's file server search had "uncovered information that for an extended period of time you have been working on your personal business. . . on CVMIC time." Gilsinger denies these allegations. He claims that, to the extent any QMCS work was completed during the normal workday, it was either done while on a lunch break or made up by working extra nights, weekends, or during vacation. The November 22, 2019 letter reiterated that Gilsinger would be permitted to appeal the decision to the Board.

On December 13, 2019, Gilsinger filed an appeal with the Board, this time challenging his termination for cause, through his attorney. The Board denied Gilsinger's appeal.

### 2.4 QMCS

In April 2018, while employed by CVMIC, Gilsinger registered his LLC, QMCS, which was a specialty preferred provider network for worker's compensation medical providers and billers. Gilsinger had developed a similar narrow PPO network and incentive plan for CVMIC members and planned to use QMCS to market the concept outside of CVMIC.

After the creation of QMCS, Gilsinger met with several medical care providers to recruit them to join his QMCS PPO network. He ultimately signed service-pricing agreements with eight providers. Between April 2018 and May 2019, Gilsinger solicited clients for his personal business, QMCS. In October 2018, Gilsinger presented the QMCS model to Ansay & Associates ("Ansay"), which he considered to be an industry "middleman," and met with Ansay again in November 2018.

Gilsinger sent CVMIC documents from his CVMIC email address to both a personal email address that he shared with his wife and his QMCS email address. On May 16, 2018, Gilsinger sent CVMIC documents that included CVMIC health care provider contracts to his personal email address. On August 6, 2018, Gilsinger emailed CVMIC provider contracts from his work email address to his personal email address. Gilsinger testified that he sent himself the provider contracts because he was the individual at CVMIC responsible for negotiating and signing the contracts and pricing agreements for CVMIC.

Gilsinger used pricing data he generated for CVMIC in a slide show he presented to Ansay related to QMCS. Gilsinger testified that when he worked on QMCS business while "on the clock for CVMIC" he only did so while using vacation time or his lunch hours, or otherwise made up any CVMIC time on nights/weekends. Gilsinger understood this to be standard practice in his department and at CVMIC as a whole.

CVMIC employees, including other managers such as Rick Bayer ("Bayer") and Pallin Allen ("Allen"), had side businesses. Horner learned about Bayer's and Allen's businesses after they were formed. Bayer disclosed the business weeks before it began earning income, and Allen disclosed his business after discussing QMCS with Horner. Horner testified that the situation with Gilsinger was different because Gilsinger did not disclose his side business. CVMIC did not have a policy in place that required Gilsinger to disclose his business, but Cole testified that having managers report any business interests, including inactive LLCs, was a longstanding practice. Voskuil filled out the conflict-of-interest form and disclosed her inactive accounting LLC when she was a part time employee.

In May 2019, Horner first learned of the existence of QMCS from Serio. After learning of QMCS, Horner performed Google research into QMCS and set up a meeting with Serio to discuss the company. Voskuil prepared audit letters to CVMIC's worker's compensation medical contractors, which Gilsinger signed, although he was unsure of why they were being sent. The purpose of the audit letters was a due diligence effort to make sure that no payments were made to non-CVMIC contracts. Horner testified that he did not speak with Gilsinger about his concerns until he first satisfied himself that there was no fraudulent activity associated with QMCS, "mean[ing] diverting payments or collecting payments outside of the contract or a kickback or any means of where money that was meant to CVMIC wasn't coming to CVMIC or payments that were unauthorized by CVMIC weren't going to anybody else." CVMIC did not receive responses from all of the providers, but based on the providers that did respond, there was no misappropriation of CMVIC funds or other fraudulent activity.

On September 9, 2019, Horner met with Gilsinger and Cole and asked Gilsinger about QMCS and whether it was an active enterprise. Gilsinger stated that QMCS was not active and that there were no clients and no revenue. QMCS has never earned revenue and never had clients. Horner accepted Gilsinger's representation that QMCS was not active, but told him that if that ever changed, he needed to alert Horner so that he could determine any potential conflict of interest.

Gilsinger alleges that Horner and Voskuil later made two separate "intentional false statements" regarding his work at QMCS. First, Gilsinger alleges that Horner, Voskuil, and Serio accused Gilsinger of misappropriating CVMIC contracts. This statement was allegedly made to Glen Boyle ("Boyle")—the manager of Equian, which was a contractor used

by CVMIC for medical costs containment services—in early December 2019. Boyle then relayed the statement to Gilsinger on December 20, 2019. Gilsinger does not have firsthand knowledge of the allegedly defamatory statements he attributes to Horner and Voskuil. Gilsinger is not sure which of the three individuals was the individual that told Boyle he misappropriated CVMIC contracts during their meeting. During his deposition, Gilsinger confirmed that "[he doesn't] know who made the statement about [him] potentially misappropriating documents."

Second, Gilsinger alleges that in "November and December 2019, CVMIC, through Ken Horner and Michelle Voskuil, falsely accused Attorney Rick Ceman of double billing CVMIC for work he had done for QMCS." Horner and Voskuil state that they did not accuse Attorney Rick Ceman ("Ceman") of "double-billing." Horner notified both Boyle and Ceman that Gilsinger had been terminated from CVMIC as a result of CVMIC's reorganization.

Gilsinger also alleges that he had actual and prospective contractual relationships with Boyle, Equian, Ceman, and Ceman's law firm, Bascom, Budish & Ceman ("BBC"), and that Serio, CVMIC, Horner and Voskuil acted in concert to interfere with those relationships. Gilsinger claims that he lost actual and prospective contract relationships with Boyle, Equian, Ceman, and BBC as a result of CVMIC and Serio making intentional false statements.

With respect to Equian and Boyle, as part of his contracting work for CVMIC, Boyle worked closely with Gilsinger. In 2018, Boyle and Gilsinger had increasingly frequent meetings to discuss QMCS, which Gilsinger explained to Boyle would develop a "narrow" provider network that

would provide medical cost containment services for companies, such as insurers, and self-insured entities, that paid worker's compensation claims.

Gilsinger acknowledges that Boyle told CVMIC on December 20, 2019 that there was no formal relationship between Equian and QMCS. Optum acquired Equian in September 2019. There was never any actual business relationship between Optum and QMCS.

With respect to Ceman and BBC, Gilsinger testified that at some point after his termination, Ceman contacted Gilsinger and told him, "it's best for them to terminate their relationship" because the "younger attorneys" felt that in order to preserve their relationship with CVMIC they could not provide legal services to QMCS. Horner and Voskuil testified that they did not tell Ceman he could not provide legal services to Gilsinger or QMCS. Ceman never told Gilsinger that CVMIC told him he could not do legal work for Gilsinger.

3.      ANALYSIS

3.1      Constitutional Claims

As a threshold matter, the parties vehemently dispute whether CVMIC is a governmental entity suable under § 1983 for purposes of Gilsinger's Fourteenth and First Amendment claims. For the deprivation of a constitutional right to be actionable, it must be "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). The case law reflects "a two-part approach to this question": (1) "the party charged with the deprivation must be a person who may fairly be said to be a state actor" and (2) "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Id.* Local government

units are "among those persons to whom § 1983 applies." *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690 (1978).

With respect to the issue of whether CVMIC is a state actor, the parties engage in what can charitably be described as a game of "he said-she said." Ultimately, whether Gilsinger, Horner, Cole, or Voskuil believe CVMIC is a governmental entity is irrelevant. ECF No. 75 at 2 (CVMIC's disputed facts). What is relevant is any undisputed evidence indicating how the State views CVMIC.[2] *See Branson v. Newburgh Police Dep't*, 849 F. Supp. 2d 802, 808 (S.D. Ind. 2011) ("[S]tate law determines the liability of local government under Section 1983.") (citing *McMillian v. Monroe County*, 520 U.S. 781, 786 (1997)); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) ("The States have extremely wide latitude in determining the form that local government takes, and local preferences have led to a profusion of distinct forms."); *Neal v. Harvey Police Dep't, a Div. of Harvey*, No. 88 C 0874, 1988 WL 77067, at *1 (N.D. Ill. July 21, 1988) ("The question whether an entity is to be considered an agency or instrumentality of the state is generally determined by reference to state law.") (citing *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 280 (1977)).

In this case, the parties submit as an exhibit to their statement of undisputed facts a July 19, 1991 letter from the State's Department of Industry, Labor and Human Relations informing CVMIC that it "[is] a

---

[2]Gilsinger submits emails, ECF Nos. 81-1, 81-2, 81-3, the authenticity of which CVMIC challenges, ECF No. 87 at 4, between his personal email account and different governmental agencies regarding CVMIC's status as a governmental entity. The Court need not consider these emails given the undisputed evidence in the record, as well as persuasive legal authority on the matter, indicating that CVMIC is a local governmental entity.

Case 2:21-cv-00831-JPS   Filed 09/19/23   Page 14 of 38   Document 89

governmental agency" for purposes of unemployment insurance because it falls within the Wis. Stat. § 108.02(17) definition of "government unit":

> this state, any school district, county, city, village, town and any other public corporation or entity, any combination thereof and any agency of the foregoing, and any public body or instrumentality of any political subdivision of this state and one or more states or one or more political subdivisions of one or more other states.

ECF No. 72-22 at 1. Section 108.02(17) mirrors the applicable definition of "local governmental unit" in this case. Wis. Stat. § 66.0509(1m)(a) and (d)(1)–(3) provides that "local governmental unit[s]," as defined in Wis. Stat. § 66.0131(1)(a), must "establish a grievance system," which must contain "(1) [a] written document specifying the process that a grievant and an employer must follow, (2) [a] hearing before an impartial hearing officer, and (3) [a]n appeal process in which the highest level of appeal is the governing body of the local governmental unit." In turn, § 66.0131(1)(a) defines "local governmental unit" as "a political subdivision of this state, a special purpose district in this state, an agency or corporation of a political subdivision or special purpose district, or a combination or subunit of any of the foregoing."

No case law exists interpreting the definition of "local governmental unit" as set forth in § 66.0131(1)(a). However, the State informed CVMIC of its position on the matter through the July 19, 1991 letter. Moreover, and equally compelling, courts have held that similar entities, analyzed through the lenses of similar state laws, are suable under § 1983. For example, multiple courts have held that the Illinois entity "Metropolitan Enforcement Group" is a local governmental unit because, under Illinois law, it is a "combination of units of local government" formed to serve local

governments, paid by local governments, and "governed by a board comprised of an . . . official . . . from each participating unit of local government." *Cervantes v. Metro. Enf't Grp. ("MEG")*, No. 01 C 4433, 2001 WL 1329295, at *1 n.1 (N.D. Ill. Oct. 29, 2001) (quoting 30 Ill. Comp. Stat. 715/1); *see also Collins v. Ne. Metro. Enf't Grp.*, No. 89 C 3077, 1991 WL 93495, at *2 (N.D. Ill. May 20, 1991) (same). The same is true as to CVMIC. CVMIC was formed by a cooperation of Wisconsin municipalities with the purpose of serving Wisconsin municipalities, is paid from public funds (i.e., premiums from municipalities), and the Board is made up entirely of municipal employees. ECF No. 76-2 at 116.[3] Thus, the Court concludes that CVMIC is a governmental entity suable under § 1983 for purposes of Gilsinger's Fourteenth and First Amendment claims.

Next, CVMIC claims that "[e]ven if Gilsinger could demonstrate that CVMIC is a 'state actor' for the purpose of § 1983, his claim nevertheless fails because his employment termination was not the exercise of a state action." ECF No. 77 at 7. In support, CVMIC cites cases regarding private entities subject to state regulation. *Id.* (citing *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) and *Flagg Bros. v. Brooks*, 436 U.S. 149, 158 (1978)). But these cases are inapposite. The Court has concluded that CVMIC is a local governmental unit, not a private entity that may be considered a "state actor" depending on whether the challenged conduct

---

[3] *See also* CVMIC Board of Directors, *available at* https://perma.cc/M9LK-HBQB (last visited Sept. 7, 2023). "[T]he Court may take judicial notice of public record information obtained from an official government website." *Ambrosetti v. Or. Cath. Press*, 458 F. Supp. 3d 1013, 1017 n.1 (N.D. Ind. 2020) (citing *Betz v. Greenville Corr. Inst.*, No. 14-cv-104-MJR, 2014 WL 812403, at *1 (S.D. Ill. Mar. 3, 2014); *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003); and *Laborer's Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002)).

"is fairly attributable to the state." *Sullivan*, 526 U.S. at 50. Thus, the Court proceeds to the merits of the constitutional claims.

### 3.1.1 Fourteenth Amendment Claim

Gilsinger alleges that, in violation of Wis. Stat. § 66.0509(1m)(a), CVMIC's Grievance Procedure does not provide for a hearing before an impartial hearing officer prior to an employee's termination (whether via reorganization or for cause). Under the Grievance Procedure, Gilsinger did not receive a hearing after he submitted his written appeal.

CVMIC's sole contention in its moving brief is that CVMIC is not a local governmental entity and therefore § 66.0509(1m)(a) does not apply. ECF No. 77 at 8–10. The Court has already rejected this argument. On reply, CVMIC argues that the Fourteenth Amendment claim fails because Gilsinger asks the Court to interpret and enforce state law, which Gilsinger should instead do through certiorari. ECF No. 87 at 5 (citing *Ottoman v. Town of Primrose*, 796 N.W.2d 411, ¶ 34 (Wis. 2011)). While arguments raised on reply are generally waived, *see Jennings v. U.S.*, 461 F. Supp. 2d 818, 833 (N.D. Ill. 2006) (collecting cases), the Court will consider this argument. *Landale Signs & Neon, Ltd. v. Runnion Equip. Co.*, 274 F. Supp. 3d 787, 791 (N.D. Ill. 2017) ("Federal courts may consider arguments raised on reply at their discretion.") (collecting cases).

CVMIC insists that Gilsinger's Fourteenth Amendment claim fails because "§ 1983 protects plaintiffs from constitutional violations, not violations of state laws." ECF No. 87 at 5 (quoting *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003)). But contrary to CVMIC's assertion, "[i]n one respect, and in one only, state law provides the basis for a claim under the Due Process Clause." *Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir. 1988). "Because 'property' is defined by law, showing that one has

'property' often depends on showing a legitimate claim of entitlement under state law." *Id.* (citing *Bd. of Regents v. Roth*, 408 U.S. 564 (1972) and *Upadhya v. Langenberg*, 834 F.2d 661 (7th Cir. 1987)).

To succeed on his Fourteenth Amendment claim, Gilsinger must prove "a cognizable property interest, a deprivation of that interest, and a denial of due process." *Palka v. Shelton*, 623 F.3d 447, 452 (7th Cir. 2010) (citing *Hudson v. City of Chicago*, 374 F.3d 554, 559 (7th Cir. 2004)). Tracking the rule stated in *Archie*, "[a] property interest in continued employment 'can be created in one of two ways, 1) by an independent source such as state law securing certain benefits; or 2) by a clearly implied promise of continued employment.'" *Id.* (citing *Phelan v. City of Chicago*, 347 F.3d 679, 681 (7th Cir. 2003)).

Gilsinger's argument begins and ends with his contention that, because CVMIC is a local government unit under § 66.0131(1)(a), § 66.0509(1m)(a) supplies the property interest in his continued employment and, by its terms, requires that he have received a hearing prior to termination of his employment. ECF No. 80 at 12–13. This is not the end of the analysis required by the case law, however. Gilsinger neglects to analyze whether the *language* of the statute, beyond the portion defining a local government unit, "confers a property interest in [his] continued employment." *Beischel v. Stone Bank Sch. Dist.*, 362 F.3d 430, 435–36 (7th Cir. 2004). If the statute does not confer a property interest in continued employment, then Gilsinger's grievance is one that "defendants did not follow the proper procedures for a layoff," which *does* fall solely and squarely within the realm of state law. *Marks v. City of Hayward*, No. 13-CV-366-BBC, 2014 WL 1515513, at *3 (W.D. Wis. Apr. 16, 2014).

The Court is not convinced that § 66.0509(1m)(a) supplies a property interest in continued employment. The Seventh Circuit in *Beischel* analyzed this question as to Wis. Stat. § 118.24(6) and (7). 362 F.3d at 436. Those provisions, similar to § 66.0509(1m), provide that a school district administrator is entitled to appeal an adverse employment decision and request a hearing. Wis. Stat. § 118.24(6)–(7).

"Under Wisconsin law, . . . a dichotomy exists between employment 'at-will' and employment which can be terminated only 'for cause.'" *Beischel*, 362 F.3d at 436. Only "[t]he latter receives due process protections." *Id.* (citing *Flynn v. Kornwolf*, 83 F.3d 924 (7th Cir. 1996)). As the *Beischel* court observed, the Wisconsin Supreme Court has held that yet another statute, Wis. Stat. § 62.13(5), confers a protected property interest on police officers and firefighters. *Id.* (citing *Larson v. City of Tomah*, 532 N.W.2d 726 (Wis 1995) and *Schultz v. Baumgart*, 738 F.2d 231 (7th Cir. 1984)). Section 62.13(5), unlike § 118.24(6) (as to school district administrators), the Seventh Circuit reasoned, explicitly "requires 'just cause' for terminations." *Id.* The fact that § 118.24(6) did not include that explicit language indicated that the plaintiff did not have a property interest in her continued employment because "[t]here [we]re no statutory limitations as to the bases on which the nonrenewal decision can rest." *Id.*; *see also Wolf v. City of Sheboygan*, No. 23-CV-149, 2023 WL 5725049, at *10 (E.D. Wis. Sept. 5, 2023) ("a city may pass an ordinance making any official removable" for cause, which triggers due process protections).

The same is true as to § 66.0509(1m). The statute provides that a local government unit must create a grievance procedure that "addresses employee terminations" and which includes (1) a document specifying the grievance process, (2) a hearing before an impartial officer, and (3) an

appeal process. Wis. Stat. § 66.0509. Unlike § 62.13, there is no requirement that a termination be based on a board's determination of "whether there is just cause . . . to sustain the charges." Wis. Stat. § 62.13(5)(em).

This conclusion is bolstered by opinions interpreting § 66.0509. In *Nesvold v. Roland*, the Western District of Wisconsin held that, as in *Beischel*, the "dichotomy . . . between employment 'at-will' and employment which can be terminated only 'for cause'" is absent from § 66.0509. 37 F. Supp. 3d 1027, 1042 (W.D. Wis. 2014) (quoting *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 904 (7th Cir. 2011)). Therefore, though the statute requires a grievance process, it does not "move[] [Gilsinger's] employment out of the 'at will' pole" because it does not include "terms limiting his employer's discretion to terminate his employment only for cause." *Id.* (citing *Kvapil v. Chippewa County*, 752 F.3d 708, 713 (7th Cir. 2014)). Similarly, in *Marks*, the court proceeded with the implicit assumption that § 66.0509 alone is insufficient to create a property interest in continued employment. 2014 WL 1515513, at *3–4. As a result, Gilsinger's Fourteenth Amendment claim fails as a matter of law for lack of a property interest. The Court will grant CVMIC's motion for summary judgment on this claim.

### 3.1.2 First Amendment Claim

Gilsinger's First Amendment claim alleges "suppression of [his] First Amendment rights through phony and retaliatory discipline." ECF No. 54 at 5. Because Gilsinger sues CVMIC, he must allege "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Khan v. Chi. Bd. of Educ.*, No. 16 CV 8668, 2022 WL 683748, at *7 (N.D. Ill. Mar. 8, 2022) (quoting

*First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021)).

Here, Gilsinger alleges, and CVMIC has not challenged, that Horner is a final policymaker for CVMIC. ECF No. 54 at 6. Gilsinger contends that his first appeal to the Board listed matters of public concern that he intended to discuss with the Board at a hearing. *Id.* at 4–5. Instead of receiving a hearing, Horner terminated Gilsinger for cause two days later and revoked the offer of a separation agreement. *Id.* at 5. Gilsinger also received "the only negative performance review" he ever received in retaliation for speaking to the Board prior to and outside the context of his written appeal. ECF No. 81 at 3.

Gilsinger must establish three elements for his First Amendment retaliation claim: that "(1) [he] engaged in activity protected by the First Amendment, (2) [he] suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was . . . 'at least a motivating factor' in the Defendant['s] decision to take the retaliatory action." *145 Fisk, LLC v. Nicklas*, 986 F.3d 759, 766 (7th Cir. 2021) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).

The crux of the parties' dispute is the first element, which entails a two-step inquiry. First, "[i]n order for a public employee to raise a successful First Amendment claim, he must have spoken in his capacity as a private citizen and not as an employee." *Renken v. Gregory*, 541 F.3d 769, 773 (7th Cir. 2008). Second, and "[o]nly if [the plaintiff] was speaking as a citizen and not as an employee, [courts] 'inquire into the content of the speech' to ascertain whether [the plaintiff's] speech touched on a matter of public concern to determine whether it is protected speech." *Id.* (quoting *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007)).

In this case, with respect to his written appeal, Gilsinger was speaking as an employee rather than as a private citizen. The inquiry requires the Court to assess whether Gilsinger's statements were made "pursuant to [his] official duties," which "focuses on 'the duties an employee is actually expected to perform.'" *Id.* (quoting *Morales v. Jones*, 494 F.3d 590, 595–96 (7th Cir. 2007)). The Seventh Circuit and the U.S. Supreme Court have repeatedly held that reports of another employee's "alleged misconduct or violation of district policy" is unprotected under the First Amendment. *See Ulrey v. Reichhart*, 941 F.3d 255, 259 (7th Cir. 2019) (collecting cases). Gilsinger's written appeal listed entirely issues pertaining to his official duties, such as Horner's pressure for Gilsinger to hire his granddaughter, Horner's accusations regarding not finishing performance evaluations, and other grievances regarding vacation time, paygrade levels, and destruction of paygrade documents.

But Gilsinger asserts that he brought other matters, including one matter of public concern, directly to the Board—and behind Horner's back—prior to his written appeal. ECF No. 84; ECF No. 81 at 3. Gilsinger claims that his First Amendment retaliation claim is based on *these* complaints to the Board, not on his written appeal, because both Horner and Voskuil testified that Gilsinger circumventing Horner to bring concerns to the Board caused Horner to lose trust in Gilsinger's ability to perform in a supervisory role. ECF No. 84; ECF No. 80 at 4–5; ECF No. 82 at 29; ECF No. 76-2 at 54–56.[4] Indeed, Horner issued Gilsinger a written warning for raising concerns to the Board behind Horner's back. ECF No. 84 (citing ECF

---

[4] CVMIC disputes this fact, citing to Gilsinger's deposition to support its contention that the November 20, 2019 written appeal is the protected speech on which his First Amendment claim relies. ECF No. 75.

No. 72-9). Gilsinger alleges that the reorganization was a pretext to terminate him due to this conduct. ECF No. 80 at 4–5.

The alleged matter of public concern was Gilsinger's contention that claims involving the City of Green Bay, one of CVMIC's biggest members, were being mismanaged, which he argues amounts to misappropriation of public funds. ECF No. 81 at 3; ECF No. 80 at 15–16. Voskuil testified that the issue specifically dealt with the City of Green Bay's efforts to get insurance coverage on a claim that otherwise would not have been covered, which involved internal profitability analyses by CVMIC on premiums versus claim payments as to the City of Green Bay. ECF No. 82 at 30. Gilsinger was concerned that CVMIC would lose the City of Green Bay as a member and that CVMIC "should be doing more." *Id.*

Gilsinger avers that he "did not go to the Board with this issue as part of [his] official job duties," but because he "was concerned about how losing the Green Bay account would impact CVMIC's reputation, and ultimately, how that would affect public funds which support CVMIC." ECF No. 81 at 3. He also points to testimony from Voskuil that "keeping Green Bay" was not a part of Gilsinger's job, and that Gilsinger, in making the report, was "concerned about the look of losing Green Bay." ECF No. 82 at 30. Assuming that Gilsinger was speaking outside of his official duties on the City of Green Bay issue, as Voskuil testified, and viewing the facts supporting the First Amendment retaliation claim in the light most favorable to Gilsinger,[5] Gilsinger's argument that this issue is a matter of public concern is not persuasive.

---

[5] In other words, the Court takes as true that the First Amendment claim is based on information brought to the Board prior to and outside the written appeal. The Court disregards evidence to the contrary such as, for example, Gilsinger's

Gilsinger cites *Knapp v. Whitaker*, 757 F.2d 827 (7th Cir. 1985) to support his position. ECF No. 80 at 15–16. In that case, the plaintiff worked as an assistant basketball coach at a high school in Peoria, Illinois. *Knapp*, 757 F.2d at 829. The high school received a substantial portion of its athletic budget from the Peoria School District. *Id.* at 840. Budget cuts resulted in a decision that mileage reimbursement would be lowered at the plaintiff's high school, but not at other Peoria public high schools. *Id.* The plaintiff complained about "the inequitable allocation of public funds to a select group of Peoria area high school coaches" in order to inform "the public and the educational policymakers of Peoria that officials . . . were failing in their duty to properly administer the allocation of public funds." *Id.* at 841. "In view of the content, form, and context of [the plaintiff's] speech," the court held that it was "a matter of public concern." *Id.* Conversely, here, Gilsinger's speech regarding the City of Green Bay was not intended to protect public funds or inform the public about how public funds are spent, but rather to protect CVMIC's interest in retaining a large member.

When assessing whether speech is a matter of public concern, courts consider "the content, form, and context of the speech as revealed by the whole record." *Gazarkiewicz v. Town of Kingsford Heights*, 359 F.3d 933, 941 (7th Cir. 2004) (internal bracketing omitted) (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)). Content "is the most important" factor. *Id.* (citing *Wainscott v. Henry*, 315 F.3d 844, 850 (7th Cir. 2003)). When analyzing the context of speech made by an employee, courts determine "the point of the speech"; specifically, "[w]as the point to further some purely private

---

statement in his written appeal that "[o]ther than [an] employment issue, I did not go to the board with decisions I did not agree with." ECF No. 72-9 at 4.

interest?" *Wainscott*, 315 F.3d at 850; *see also Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999) (assessing speech about "sex discrimination in public employment" and determining that, despite the subject matter, "the point of the plaintiff's speech was simply to further his own goal of expressing his displeasure with the Chief's policies").

On the record before the Court, it is clear that the content of Gilsinger's speech related to the profitability of CVMIC and how CVMIC employees, specifically Voskuil, could do more to keep the City of Green Bay as a member. As to form and context, the speech was made privately to certain members of the Board and was not driven by a desire to protect against the misappropriation of public funds. *See Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis*, 42 F.3d 403, 410 (7th Cir. 1994) ("The record as a whole belies [the plaintiff's] assertion that she spoke in order to call public attention to the problems addressed.").

Instead, Gilsinger avers that he was concerned about CVMIC losing the City of Green Bay's business. If anything, Gilsinger was worried about CVMIC losing public funds, which would hurt CVMIC, not about public funds being spent wastefully or in a way that would harm or affect the public. *Compare Chaklos v. Stevens*, 560 F.3d 705, 713 (7th Cir. 2009) (letter offering lower cost services with the plaintiff's private company that also revealed "inefficient spending of public funds" raised a matter of public concern), *with Colburn v. Trs. of Ind. Univ.*, 973 F.2d 581, 587 (7th Cir. 1992) ("[W]here the overriding reason for the speech is the concerns of a few individuals whose careers may be on the line, the speech looks much more like an internal personal dispute than an effort to make the public aware of wrongdoing."). Gilsinger simply does not thread the needle to establish that CVMIC's reputation or profitability affects the public in any way so as

to garner public concern. Because Gilsinger's speech is not protected, the Court need not examine whether the alleged reorganization or any other actions by Horner, the Board, or CVMIC were retaliatory. For all these reasons, the Court will grant CVMIC's motion for summary judgment on Gilsinger's First Amendment retaliation claim.

### 3.2 State Law Claims

Having determined that CVMIC is entitled to summary judgment on both of Gilsinger's federal claims, the Court is not required to exercise supplemental jurisdiction over Gilsinger's state law claims. *Dargis v. Sheahan*, 526 F.3d 981, 990 (7th Cir. 2008) (citing 28 U.S.C. § 1367(c)(3)).

> [T]he district courts should exercise this discretion to relinquish jurisdiction over state law claims that remain after the dismissal of federal claims unless any of the following three circumstances exists: (1) the state law claims may not be refiled because a statute of limitations has expired, (2) substantial judicial resources have been expended on the state claims, or (3) it is clearly apparent how the state claims are to be decided.

*Id.* (citing *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007)). The parties do not brief the issue of supplemental jurisdiction. However, because the parties devote almost half of their briefing to the state law claims, the state law claims have been previously briefed and/or adjudicated in Rule 12 motions, ECF Nos. 21, 35, 40, and because it is clearly apparent how they should be decided, the Court will proceed to address them.

#### 3.2.1 Defamation

Gilsinger raises two allegedly defamatory statements made by CVMIC employees after he was fired. ECF No. 80 at 17. First, he asserts that either (or a combination) of Horner, Voskuil, and Serio told Boyle in early December 2019 that Gilsinger was misappropriating CVMIC contracts,

which Boyle relayed to Gilsinger. *Id.*; ECF No. 54 at 8. Second, he claims that in November and December 2019, Horner and Voskuil accused Ceman of double billing CVMIC for work he had done for QMCS, which Ceman relayed to Gilsinger. ECF No. 80 at 17–18; ECF No. 54 at 8.

Gilsinger must establish three elements for his defamation claim under Wisconsin law: "(1) the statement must be false; (2) the statement must be communicated by speech, conduct or in writing to a person other than the person defamed; and (3) the communication must be unprivileged and tend to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her." *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007) (citing *Torgerson v. Journal/Sentinel, Inc.*, 563 N.W.2d 472, 477 (Wis. 1997)).

Any testimony by Gilsinger that Boyle told him that Horner, Voskuil, and/or Serio said that Gilsinger was misappropriating contracts is not admissible. *Id.* at 1011 ("Where a plaintiff attempts to introduce the testimony of an individual who did not personally witness the alleged defamatory statement but was later told by another that the statement was made, such testimony is rejected as hearsay . . . . This is precisely what [the plaintiff] is attempting to do through his own testimony.") (citing *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003); *Bularz v. Prudential Ins. Co. of Am.*, 93 F.3d 372, 377–78 (7th Cir. 1996)).[6] Thus, as the parties

---

[6] "[A] court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). Nor is inadmissible evidence sufficient to overcome summary judgment. *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003). The burden is on the proponent of the fact and its supporting evidence to "explain the admissible form that is

acknowledge, the Court must look to Boyle's testimony, which is the only admissible evidence that Gilsinger offers on the matter. *Id.* at 1010; *see also* ECF No. 80 at 17–19.

Gilsinger claims that "Boyle testified that Horner told [Boyle] [that] Gilsinger was transferring contact information, contracts, pricing arrangements, or other data to [Gilsinger's] business account." ECF No. 80 at 18 (citing Boyle Deposition Transcript ("Boyle Tr."), later docketed at ECF No. 76, at 49). However, when asked whether he remembered Horner telling him anything about Gilsinger "transferring contact information, contracts, pricing arrangements, or other data," Boyle responded "[n]o, but . . . I do recall [Horner] saying that . . . [Gilsinger] was using the same lawyer that CVMIC did for contracts." ECF No. 76 at 50–51. As the parties' undisputed facts show, this statement is true and is therefore not actionable in defamation.

In the same vein, Gilsinger asserts that Boyle testified that he understood Horner's statements as impliedly communicating that "Gilsinger had misappropriated CVMIC contracts." ECF No. 80 at 18 (citing Boyle Tr., ECF No. 76, at 54). Again, Boyle testified that he inferred that Gilsinger's use of Ceman was problematic, not that he inferred that Gilsinger was misappropriating CVMIC contracts. ECF No. 76 at 53–55. Indeed, when directly asked whether "anybody at CVMIC ever [told him] that [Gilsinger] was misappropriating CVMIC's contracts," Boyle again responded "no, only to the extent that they informed me that he was using the same attorney that drafted the contracts for their own in-house surgical

anticipated." Fed. R. Civ. P. 56, Committee Notes on Rules—2010 Amendment. Gilsinger has not done so.

bundles." *Id.* at 102–103. Thus, any defamation claim as to statements made to Boyle that Gilsinger was misappropriating contracts fails as a matter of law for lack of admissible evidence that the statements were made. The statements that are proven to have been made are indisputably true and not actionable.

Gilsinger's defamation claim as to statements made by Horner and Voskuil to Ceman that Ceman was double billing CVMIC and QMCS fails for similar reasons. Any testimony from Gilsinger that Ceman told him he was accused of double billing is inadmissible. *Schindler*, 474 F.3d at 1010. Moreover, what Gilsinger *actually* testified to is that he learned of this accusation during a mediation "where we had an exchange of information, and the mediator then called Ceman to clear up this issue of double billing." ECF No. 72-1 at 202–203. Despite Gilsinger's current claims to the contrary (i.e., that Ceman told him about the accusation), his prior testimony under oath shows that Gilsinger himself did not even learn this information directly from Ceman, creating another layer of hearsay. Further, because it does not appear that Ceman was deposed, the admissible testimony on the issue comes from Horner and Voskuil, who both testified that they did not accuse Ceman of double billing. ECF No. 82 at 32; ECF No. 76-2 at 143–44. For all these reasons, the Court will grant CVMIC's motion for summary judgment on Gilsinger's defamation claim.

### 3.2.2 Intentional Interference with Professional Relationships

Gilsinger asserts that CVMIC interfered with his actual and prospective contractual relationships with Boyle, Equian, Ceman, and BBC "by making it clear that CVMIC would not do business with individuals

who did business with Gilsinger, and by accusing Gilsinger of serious ethical breaches which CVMIC knew to be untrue." ECF No. 80 at 19.

Gilsinger must establish five elements for his claim of intentional interference with professional relationships under Wisconsin law: "(1) the plaintiff had a contract or a prospective contractual relationship with a third party, (2) the defendant interfered with that relationship, (3) the interference by the defendant was intentional, (4) there was a causal connection between the interference and damages, and (5) the defendant was not justified or privileged to interfere." *Wesbrook v. Ulrich*, 840 F.3d 388, 395 (7th Cir. 2016) (quoting *Briesemeister v. Lehner*, 720 N.W.2d 531, ¶ 48 (Wis. Ct. App. 2006)). The first element requires a showing of "an existing contract or [a] sufficiently concrete prospective contract." *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 689 (7th Cir. 1999), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).

The evidence shows that Gilsinger did not have an existing or sufficiently concrete prospective contract with Boyle and Equian. Gilsinger testified that on September 9, 2019, he met with Horner and Cole and told them that QMCS was "not active; that there were no clients and no revenue." ECF No. 72-1 at 46–47. Boyle testified that "internally at Equian there was no interest or minimal interest in working with QMCS," ECF No. 76 at 33, and that a business relationship was "very, very improbable," *id.* at 102. In response, Gilsinger points to his affidavit, where he avers that he "had [an] actual or prospective business relationship[] with Equian," ECF No. 81 at 4, and testimony from Horner that he met with Boyle in December 2019 to figure out whether "there [was] a business relationship [t]here . . . that [he] need[ed] to be aware of," ECF No. 76-2 at 42, and that "Equian had a business relationship with [Gilsinger]," *id.* at 49. Gilsinger also raises

testimony from Boyle regarding a text message he sent to Gilsinger in March 2019 saying that Boyle was "certain Equian will partner." ECF No. 76 at 127.

However, mere business relations are not actionable. *Shank*, 192 F.3d at 686; *see also Roumann Consulting Inc. v. Symbiont Constr., Inc.*, No. 18-C-1551, 2019 WL 3501527, at *9 (E.D. Wis. Aug. 1, 2019) ("[T]he idea that Wisconsin does not recognize a cause of action for tortious interference with a mere business relationship is reflected in its pattern jury instruction on tortious interference, which lists the first element of the claim as proof of the existence of a contract or prospective contractual relationship.") (citing Wis. J.I.—Civil § 2780 (2014)).

A prospective contract, like an actual contract, requires a meeting of the minds and a "manifested . . . intent[] to be bound to an agreement, the terms of which are sufficiently certain and definite." *Shank,* 192 F.3d at 684 (citing *Novelly Oil Co. v. Mathy Constr. Co.*, 433 N.W.2d 628, 630 (Wis. Ct. App. 1988) ("Plaintiffs' failure to come forward with any evidence as to the intent of the [third party] to enter into contracts with Plaintiffs is necessarily fatal to their claim that they had prospective contractual relationships with [the third party].")); *see also Armament Sys. & Procs., Inc. v. Emissive Energy Corp.*, No. 06-C-833, 2007 WL 2572304, at *5 (E.D. Wis. Sept. 5, 2007) ("[A] bare assertion that [the respondent] disrupted [the claimant's] general business prospects does not state a claim.") (citing *Shank*, 192 F.3d at 688–89). Gilsinger's affidavit, while sufficient to show his own intent, does not create a genuine dispute of fact as to Boyle's or Equian's intent; nor does Boyle's March 2019 text message, sent well before Gilsinger's own statements to CVMIC to the contrary and Optum's acquisition of Equian.

With respect to Ceman and BBC, Gilsinger has failed to proffer sufficient evidence to establish that CVMIC interfered with the relationship, that the interference was intentional, and that there was a causal connection between the interference and any damages. In his affidavit, Gilsinger avers that "[i]n 2020, . . . Ceman told me that [he] could not continue working with me without risking CVMIC's retaliation." ECF No. 81 at 4. However, at his deposition, Gilsinger testified that Ceman never told him that CVMIC told Ceman he couldn't work with Gilsinger and, further, that he "[didn't] know . . . [if] someone from CVMIC called Ceman and said [he was] double billing." ECF No. 72-1 at 200, 202. Indeed, both Horner and Voskuil testified that they did not make any such statement to Ceman. ECF No. 82 at 32; ECF No. 76-2 at 143–44.

The Court must disregard "an affidavit that contradicts the party's prior deposition or other sworn testimony." *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) **(**citing *Dunn v. Menard, Inc.*, 880 F.3d 899, 910 (7th Cir. 2018)). Because the only evidence Gilsinger points to is his own affidavit recounting Ceman's alleged statement to Gilsinger, ECF No. 80 at 20, the claim fails for lack of evidence. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("[S]ummary judgment 'is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'") (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). As a result, the Court will grant CVMIC's motion for summary judgment on Gilsinger's claim for tortious interference with professional relationships.

Case 2:21-cv-00831-JPS   Filed 09/19/23   Page 32 of 38   Document 89

### 3.2.3 Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing

Gilsinger alleges that CVMIC breached his employment contract "when it denied progressive discipline protection and an appeal hearing." ECF No. 54 at 15. Similarly, Gilsinger alleges that CVMIC "breached its covenant of good faith and fair dealing with Gilsinger when it terminated Gilsinger and refused to allow him to appeal the decision." *Id.* at 16. Both the breach of contract and breach of the covenant of good faith and fair dealing claims require Gilsinger to prove the existence of a valid contract with enforceable terms. *Reetz v. Advoc. Aurora Health, Inc.*, 983 N.W.2d 669, ¶¶ 23, 31 (Wis. Ct. App. 2022) (citing *Piaskoski & Assocs. v. Ricciardi*, 686 N.W.2d 675, ¶ 7 (Wis. Ct. App. 2004) and *Beidel v. Sideline Software, Inc.*, 842 N.W.2d 240, ¶ 27 (Wis. 2013)). Both claims fail on this basis.

Gilsinger argues that the Employee Manual "create[s] enforceable contract rights." ECF No. 80 at 20. However, at his deposition, Gilsinger testified that he did not "consider[] the employee policy and procedure manual a contract between [him] and CVMIC," ECF No. 72-1 at 249, and stated the same in response to CVMIC's requests for admission, ECF No. 72-11 at 3. Gilsinger may not manufacture facts or beliefs on summary judgment that contradict his prior statements under oath. *See James*, 959 F.3d at 316.

Notwithstanding the factual conflict, Gilsinger fails to explain how the Employee Manual abrogates employment at-will and creates contractual rights in the face of its explicit disclaimer that its policies "are intended as guidelines, and the Employee Manual does not create a contract between CVMIC and any of its employees." ECF No. 74 at 13; *see Helland v. Kurtis A. Froedtert Mem'l Lutheran Hosp.*, 601 N.W.2d 318, 322–24 (Wis. Ct.

App. 1999) (disclaimer that "This Handbook is not intended to create, nor does it create, contract rights" does not allow for creation of contractual right or modify at-will status) (citing *Olson v. 3M Co.*, 523 N.W.2d 578, 589 (Wis. Ct. App. 1994) (concluding that providing a handbook for "guidance" was insufficient to alter "at-will" employee status)). In other words, he does not explain which rights set forth in the Employee Manual are contractual in nature or, taking it one step further, were breached here.

Gilsinger next cites to *Clay v. Horton Manufacturing Co.*, 493 N.W.2d 379, 381 (Wis. Ct. App. 1992) (citing *Garvey v. Buhler*, 430 N.W.2d 616, 618–19 (Wis. Ct. App. 1988)) for the proposition that a company may abrogate employment at-will through an employee handbook *or* through unwritten policies communicated through superiors. ECF No. 80 at 21; *see also Murphy v. Bruno Indep. Living Aids*, 642 N.W.2d 647, ¶ 16 (Wis. Ct. App. 2002) (implied contract may be created by conduct separate from employee handbook). According to Gilsinger, CVMIC modified its employees' employment at-will status, as set forth in the Employee Manual, in practice. He testified that "[i]t has never been the practice of CVMIC to fire somebody for cause without going through some sort of . . . progressive disciplinary process"[7] separate from the Grievance Procedure and that Cole told him that "nobody [at CVMIC] is really at will anymore." ECF No. 72-1 at 248, 250. He also points to testimony from Cole that a former employee,

---

[7] Parenthetically, though the breach of contract and breach of the covenant of good faith and fair dealing claims are based on alleged policies of both progressive discipline and an appeal, Gilsinger appears to have abandoned the appeal portion of the claim on summary judgment. Even so, the undisputed facts show that Gilsinger was permitted a written appeal in accordance with the Grievance Procedure, and he does not argue any contractual right—express or implied—to a hearing.

Strike, was offered progressive discipline and a last chance agreement because Cole "didn't think there was enough there to fire her." ECF No. 76-3 at 37–38.

However, when the policy cited by the plaintiff as providing a contractual right expressly disclaims that right and reserves the right to discharge the employee at-will, the plaintiff fails to state a breach of contract claim. *See Bach v. Centocor Ortho Biotech, Inc.*, 519 F. App'x 937, 940–41 (7th Cir. 2013) ("[The plaintiff] has not identified a company policy here that promises a term of employment or flexible hours. In fact, the policies that she cites expressly disclaim any such promises and reserve to [the employer] the right to change its policies and discharge employees at will. (collecting cases); *see also Peninsular Carpets, Inc. v. Bradley Homes, Inc.*, 206 N.W.2d 408, 416 (Wis. 1973) (holding that "the legal effect to be given an agreement may . . . be determined on a motion for summary judgment" but that the intent of the parties presents a fact issue inappropriate for summary judgment).

In this case, Gilsinger signed Strike's last chance agreement, which contained a bold-faced, all-caps provision stating that the agreement in no way changed Strike's at-will employment status with CVMIC. ECF No. 72-23. The Employee Manual also provided that "employment at-will may not be modified by any officer or employee and shall not be modified in any publication or document." ECF No. 74 at 13. Together, these documents and Gilsinger's signature acknowledging both, show that any intent to alter the at-will relationship was disclaimed, and that Gilsinger was made aware of the disclaimer. Therefore, the Court will grant CVMIC's motion for summary judgment on Gilsinger's breach of contract and breach of the covenant of good faith and fair dealing claims.

### 3.2.4   Promissory Estoppel

Finally, Gilsinger alleges that even if he did not have a contract with CVMIC requiring progressive discipline and an appeal hearing, Gilsinger "reasonably relied upon [CVMIC's] promise of progressive discipline protection and an appeal hearing." ECF No. 54 at 15. Gilsinger specifically alleges that he relied on Cole's representations that no one at CVMIC was really employed at-will. ECF No. 80 at 21. Gilsinger does not brief any facts supporting reasonable reliance as to an appeal hearing. The Court surmises that Gilsinger claims that he relied upon Horner's email confirming receipt of Gilsinger's request to appeal in person and stating that the appeal would be heard in person at the November 20, 2019 Board meeting. This request was ultimately denied "consistent with the policy that such appeals are to be presented on a written basis." ECF No. 72-13. As noted *supra* note 7, Gilsinger does not identify any unwritten policy as to an appeal hearing.

Gilsinger must establish three elements for his promissory estoppel claim under Wisconsin law: that "(1) there was '[a] promise that the promisor should reasonably have expect[ed] to induce action or forbearance of a definite and substantial character on the part of the promisee;' (2) the promise 'induce[d] such action or forbearance;' and, (3) the 'injustice can be avoided only by enforcement of the promise.'" *Don-Rick, Inc. v. QBE Ams.*, 995 F. Supp. 2d 863, 872 (W.D. Wis. 2014) (quoting *Hoffman v. Red Owl Stores, Inc.*, 133 N.W.2d 267, 275 (Wis. 1965) and citing *Beer Capitol Distrib., Inc. v. Guinness Bass Imp. Co.*, 290 F.3d 877, 880 (7th Cir. 2002)). Where a promise states, in the same instrument, that the promisor "ha[s] no intention to be bound," there can be no claim for promissory estoppel. *Id.* Thus, for the same reasons explained above as to the contract

claims, the promissory estoppel claim fails, and the Court will grant CVMIC's motion for summary judgment on this claim.

## 4. CONCLUSION

For the reasons explained above, the Court grants CVMIC's motion for summary judgment. ECF No. 71. As a result, the case will be dismissed.

Accordingly,

**IT IS ORDERED** that the parties' stipulation of dismissal of Plaintiff Greg Gilsinger's claim for injury to business under Wis. Stat. § 134.01 against Defendant Cities and Villages Mutual Insurance Company, ECF No. 68, be and the same is hereby **ADOPTED**;

**IT IS FURTHER ORDERED** that Plaintiff Greg Gilsinger's claim for injury to business under Wis. Stat. § 134.01 against Defendant Cities and Villages Mutual Insurance Company, ECF No. 54 at 14, be and the same is hereby **DISMISSED without prejudice and without costs**;

**IT IS FURTHER ORDERED** that Defendant Cities and Villages Mutual Insurance Company's motion for summary judgment, ECF No. 71, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff Greg Gilsinger's claims for (1) Fourteenth Amendment violation of the right to procedural due process; (2) First Amendment retaliation; (3) common law defamation; (4) common law intentional interference with professional relationships; (5) common law breach of contract; (6) common law promissory estoppel; and (7) common law breach of the covenant of good faith and fair dealing, ECF No. 54 at 12–16, be and the same are hereby **DISMISSED with prejudice**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 19th day of September, 2023.

BY THE COURT:

_____

J.P. Stadtmueller
U.S. District Judge